UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
------------------------------------------------------------

DOMINIQUE LENNON,                 :
                                  :        Case No. 1:18-cv-2216
          Petitioner,             :
                                  :
vs.                               :        OPINION & ORDER
                                  :        [Resolving Doc. 1]
WARDEN CHAE HARRIS,               :
Warren Correctional               :
Institution,                      :
                                  :
          Respondent.             :
------------------------------------------------------------

JAMES S. GWIN, UNITED STATES DISTRICT JUDGE:

Petitioner Dominique Lennon, an Ohio inmate serving a 21-year sentence for two counts of attempted murder and other crimes, asks this Court for federal habeas corpus relief under 28 U.S.C. § 2254.  Lennon argues that the following state court proceeding errors warrant relief: (1) prosecutorial misconduct, (2) the trial court's failure to instruct the jury regarding the potential misidentification of Lennon as the suspect, (3) ineffective assistance of trial and appellate counsel, and (4) insufficient evidence to support Lennon's conviction. The state of Ohio opposes Lennon's § 2254 petition.  For the following reasons, the Court **DENIES** Lennon's petition

I.      BACKGROUND

The facts surrounding Lennon's convictions were described by the Ohio Court of Appeals.[1]  Because Lennon has not meaningfully disputed them, this Court accepts them as correct[2]:

---

[1] *State v. Lennon*, No. 104344, 2017 WL 1957124 (Ohio Ct. App. 8th Dist. May 11, 2017).
[2] 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall

Case No. 1:18-cv-2216
Gwin, J.

{¶ 3} In October 2015, a Cuyahoga County Grand Jury indicted Lennon on ten counts: attempted murder of the first victim, D.D., in violation of [Ohio Rev. Code §] 2923.02 and 2903.02(A), a first-degree felony, with one- and three-year firearm specifications; two counts of felonious assault against D.D. in violation of [Ohio Rev. Code §] 2903.11(A)(1) and 2903.11(A)(2), second-degree felonies, with one- and three-year firearm specifications; attempted murder of the second victim, Quantez Lawson ("Lawson"), in violation of [Ohio Rev. Code §] 2923.02 and 2903.02(A), a first-degree felony, with one- and three-year firearm specifications; two counts of felonious assault against Lawson in violation of [Ohio Rev. Code §] 2903.11(A)(1) and 2903.11(A)(2), second-degree felonies, with one- and three-year firearm specifications; discharge of a firearm on or near a prohibited premise in violation of [Ohio Rev. Code §] 2923.162(A)(3), a first-degree felony, with one- and three-year firearm specifications; carrying a concealed weapon in violation of [Ohio Rev. Code §] 2923.12(A)(2), a fourth-degree felony; improperly handling firearms in a motor vehicle in violation of [Ohio Rev. Code §] 2923.16(B), a fourth-degree felony; and vandalism in violation of [Ohio Rev. Code §] 2909.05(B)(1)(b), a fifth-degree felony.

{¶ 4} The charges giving rise to the indictment alleged that on August 21, 2015, in the area of East 116th Street and Buckeye Avenue, in Cleveland, Ohio, Lennon brandished a handgun and fired numerous rounds toward a group of people known as the "Buckeye Boys." The first victim, D.D., was a 13–year–old boy who was shot in the right hand. The second victim, Lawson, was struck in the leg and buttocks. Huntington Bank, a business nearby, also sustained damage as a result of the gunshots. Lennon pleaded not guilty to all charges.

{¶ 5} Before trial, Lennon moved to suppress D.D.'s pretrial identification testimony. At a hearing before trial, Lennon's counsel withdrew the motion. At this hearing, plaintiff-appellee, state of Ohio, informed the trial court and Lennon's counsel that an eyewitness had recently come forward. The eyewitness, T.H., was the 16–year–old sister of D.D. Lennon's counsel orally moved to suppress T.H.'s identification.

A.  The Suppression Hearing

---

have the burden of rebutting the presumption of correctness by clear and convincing evidence.").

-2-

Case No. 1:18-cv-2216
Gwin, J.

{¶ 6} The trial court held a hearing on Lennon's motion to suppress where the following testimony was presented.

{¶ 7} T.H. testified that in March 2015, she first heard of a person named "Boom" because two of her friends were in a car accident with him. At this time, she also learned that Boone's first name was Dominique. In June or July 2015, T.H. saw the Buckeye Boys "beat[ing] up" Boone at the liquor store located at East 116th Street and Buckeye Avenue—the same area where the shootings in this case occurred. This was the first time T.H. saw Boone and "put a face with the name." T.H. never actually met Boone.

{¶ 8} On August 21, 2015, the day D.D. and Lawson were shot, T.H. was walking behind D.D. as he walked to the liquor store to buy food. She saw two cars, a "silver four door van and a white car," drive into a parking lot. She saw someone exit the silver van, go by a tree, and shoot towards Joe–Joe— Lawson's "street name." T.H. testified that the shooter wore a black jogging suit.

{¶ 9} Once the shooting began, T.H. ran to her house. From there, she saw the shooter return to the vehicle and "saw his face when he got back into the car." She testified the shooter was Boone—the same person she saw the Buckeye Boys previously fighting with at the liquor store.

{¶ 10} T.H. testified that the day after the shootings Boone "came back shooting at the Buckeye Boys." T.H. testified that Boone was alone and driving a brown truck. At that time, Boone looked T.H. in the eyes and she knew he was the "guy from the day before."

{¶ 11} T.H. testified, however, that she did not see how D.D. was shot. She was not sure if there was anyone other than Boone shooting a gun, although she heard two guns. She testified that "there was some other boy with a gun," but she did not know his name.

{¶ 12} T.H. failed to tell police what she witnessed until the week of Lennon's trial. She testified that she did not tell police because "at first I didn't want to speak. Because my mom said don't speak if I'm not spoken to."

-3-

Case No. 1:18-cv-2216
Gwin, J.

{¶ 13} When she came forward, she gave a statement to Detective Daugenti. She told him that she was familiar with Boone. T.H. testified that the detective showed her a single photograph and stated: "I am going to show you a photo of Dominique Lennon, is that who you know as Boo[ne]?" T.H. answered, "Yes." T.H. also testified that the detective showed her a sheet with six photographs of young African American men and asked her to choose the person who shot D.D. T.H. said that the detective did not tell her who to pick and did not tell her that the shooter may or may not be in the photographs. T.H. testified she picked Boone's photograph immediately because of his dreadlocks.

{¶ 14} T.H. made an in-court identification of Boone as Lennon and said that Lennon was the shooter.

{¶ 15} Detective Shay testified that he was the lead investigator for Lennon's case until January 2016, when he left for a position in basic patrol. He testified that Detective Daugenti took T.H.'s statement, but that he was present during the end of it. Detective Shay testified that he had compiled a six-photo lineup during the course of his investigation, but he disagreed with T.H. that she was shown the lineup. He made it clear that she was not shown the lineup because she knew Lennon. Therefore, Detective Daugenti only showed T.H. one photograph of Lennon, which was from the Ohio Law Enforcement Gateway system.

{¶ 16} Detective Shay testified that it is the Cleveland Police Department's written procedure that when a victim or witness does not know the suspect, a photo lineup must be used. When a victim or witness knows the suspect, a photo lineup is not necessary.

{¶ 17} After hearing T.H.'s and Detective Shay's testimony, the trial court denied Lennon's motion to suppress. The trial court noted that under [Ohio Rev. Code §] 2933.83, which sets forth eyewitness identification procedures in lineups, it had to consider whether police failed to comply with the statute. The trial court stated, "I don't think this is a complete stranger scenario, which would at least, in my opinion, require a complete compliance or substantial compliance with [Ohio Rev. Code §] 2933.83. But [T.H.] knew who he was." The trial court found:

-4-

Case No. 1:18-cv-2216
Gwin, J.

> [T.H.'s] testimony, and her in-court identification, as well, was
> certainly that of a level of certainty. And that goes along with
> her testimony of having met this guy previously or knew who
> he was prior. It's not to say I wouldn't entertain particular
> requests for jury instructions at a later point. But at this point in
> time she'll be able to testify on the identification[.] So I'm going
> to deny your motion.

### B. Jury Trial

{¶ 18} The matter proceeded to a jury trial and the following evidence was
presented.

{¶ 19} D.D.'s mother, Tamika Palmer ("Palmer"), testified that D.D. is dyslexic
and developmentally delayed. On the day of the shootings, she gave D.D.
money to walk to the liquor store to buy food. D.D. was with another young
boy. Palmer's house is not far from the area where the shootings occurred.
Soon after D.D. left, Palmer heard gunshots. She went outside and saw her
daughter, T.H., by the liquor store. She then learned that her son had been
shot and ran to help him.

{¶ 20} The day after the shootings, Palmer was with D.D. when Detective
Shay came to her home. She witnessed D.D. identify a man named Boone as
the shooter.

{¶ 21} The next day she was again with D.D. when Detective Shay showed
D.D. a photo lineup with six color photographs. She witnessed D.D.
pick Lennon's photograph from the photo lineup. She made certain that her
son was sure and told him that if he was not sure, then he should not pick
anyone. She signed the photo lineup for D.D. because he could not write due
to his hand being shot.

{¶ 22} D.D. testified that on the day of the shootings, he and his friend walked
to the liquor store after he received money from his mother. He heard a
gunshot, looked back, saw someone with a black "hoodie," and heard more
gunshots. D.D. testified he saw a "little bit" of the shooter's face. He then
started running, not realizing that he had been shot in the hand.

Case No. 1:18-cv-2216
Gwin, J.

{¶ 23} D.D. recalled giving Detective Shay the name Boone, looking at a group of photographs, and choosing the person who he believed shot him. He testified that no one told him he had to identify anyone. He chose Lennon because he saw part of the shooter's face at the time of the shooting and recognized his skin color and dreadlocks.

{¶ 24} D.D. testified that when he chose Lennon from the photo lineup, he was about 30 percent certain, and on the witness stand he said that he was 40 percent certain of his identification. When asked at trial if he knew who shot him, D.D. testified, "yes," and identified Lennon as the shooter. Then, D.D. stated that he was "not sure" who shot him. D.D. admitted that he was scared because Lennon knew where he lived.

{¶ 25} T.H.'s trial testimony was similar to her testimony at the suppression hearing. She testified that the shooter wore a black jogging suit, which she explained meant sweat pants and a "hoodie." T.H. testified that she knew the shooter was Lennon "[b]ecause his dreads were sticking out, and I saw his face. He didn't have nothing on his face." She came forward at trial because D.D. was scared to testify. She made an in-court identification of Lennon as the shooter.

{¶ 26} Lawson testified that he has known Lennon for about two or two and one-half years. Lennon used to "chill" with the Buckeye Boys until he allegedly stole money from one of them. Lawson said that the Buckeye Boys physically fought with Lennon approximately two or three weeks before the shootings.

{¶ 27} Days after the shootings, Lawson told police that the shooter was wearing all black with a "hoodie." At trial, however, Lawson claimed that he told this to police because he "had just got out of surgery and they was waking me up out of my sleep," so he made up the description. Lawson then testified that he did not know who shot him, but stated that he had seen Lennon with a gun in the past. Lawson also testified that Lennon sent him a letter after the shootings, which he gave to police. In the letter, Lennon discussed his theory about the shootings, including who shot D.D. and Lawson; Lennon said it was "Joe" a cousin of Lawson's friend "Munchy."

{¶ 28} An employee of Huntington Bank testified about the bullet holes and damage to the bank because of the shootings.

Case No. 1:18-cv-2216
Gwin, J.

{¶ 29} Officer Paul Benedictis ("Officer Benedictis") testified that on the day of the shootings, he went to the hospital to check on D.D. At that time, D.D. gave a description of the suspect and Officer Benedictis made a broadcast accordingly: the suspect was a black male, around 20 years old, wearing black, possible dreads, about 5'10", 160 pounds, and had black hair.

{¶ 30} Officer Bauhof testified about his extensive knowledge of the area where the shootings occurred. He knew that Lawson, the Buckeye Boys, and Lennon frequented the area. He testified that Detective Shay contacted him after the shootings to ask if he knew someone with a "street name" of Boone. Officer Bauhof confirmed that he gave Lennon's name to Detective Shay. He also testified that Lennon was known to carry a gun.

{¶ 31} A forensic scientist testified that Lawson tested positive for gunshot residue.

{¶ 32} Yolanda Rivers testified that she owned the home closest to where the shootings occurred. She was home when the shootings occurred. She said that it was light outside, and when she heard the gunshots she went to her kitchen window. At that time, she saw an African American male with dreadlocks in a black shirt and black pants who was behind a tree. She then saw the male run and enter a gray truck that drove away. She did not see a gun and did not see the shootings.

{¶ 33} Sabrina Lindsey was at her sister Yolanda Rivers's house at the time of the shootings. She heard "a whole bunch of shooting going on" and she called 911. She testified that she saw an African American male with a gun who jumped in the back seat of a Ford Escape. The 911 recording confirmed that Lindsey "believed [the shooter] had on some blue jeans," but "that it just happened so fast."

{¶ 34} Detective Todd Marazzi, a firearms examiner, testified that there were two guns involved in the incident. One gun fired nine shots, while the other fired five shots.

{¶ 35} Detective Shay, the lead investigator, testified that on the day after the shootings, he met with D.D. at his home. At that time, D.D. gave a description of the suspect as a black male, about 20 years old, with dreadlocks, wearing

Case No. 1:18-cv-2216
Gwin, J.

all black with a "hoodie," 5'8" to 5'10", and had a medium to slim build. It was also at this time that D.D. identified the shooter as Boone.

{¶ 36} Detective Shay testified that after D.D. gave him the shooter's name, he contacted Officer Bauhof who conveyed that Boone was Lennon. Detective Shay then obtained Lennon's photograph and constructed a photo lineup using the Ohio Attorney General's photo lineup Wizard program.

Detective Shay stated that the color photo lineup contained a photograph of Lennon and five fillers of individuals.

{¶ 37} Two days after the shootings, Detective Shay went to D.D.'s house to show him the photo lineup. He testified that he was not a blind administrator, but that there was no blind administrator available because it was a Sunday and there were no other detectives in the office. Detective Shay testified that he documented that there was "no blind administrator available." He testified that he thought it was imminent to try to obtain an identification "[b]ecause it was becoming apparent that cooperation was going to be sketchy, at best."

{¶ 38} Detective Shay showed D.D. the photo lineup and told D.D. that the suspect may or may not be in the lineup. He testified that he did not steer D.D. to make any identification. D.D. reviewed the photo lineup and picked photograph number five, which was Lennon. Detective Shay testified that D.D.'s mom signed his name to the photo lineup. Detective Shay then wrote "95 percent" next to the line for photograph number five. Detective Shay stated that 95 percent was the "degree of confidence" relayed by D.D. at the time of the identification. Detective Shay made sure that D.D. understood what "degree of confidence" meant.

{¶ 39} With respect to T.H. and her statement obtained before trial, Detective Shay testified as he did during the suppression hearing.

C.  Verdict and Sentence

{¶ 40} After hearing the testimony and considering the evidence, the jury found Lennon guilty on all counts. After the verdict, the trial court proceeded to sentencing.

Case No. 1:18-cv-2216
Gwin, J.

{¶ 41} For purposes of sentencing, the trial court merged the attempted murder and two felonious assault convictions with respect to each victim (Counts 1, 2, and 3 merged for D.D., and Counts 4, 5, and 6 merged for Lawson). The trial court further merged the respective one- and three-year firearm specifications attached to each attempted murder conviction (leaving a three-year specification on each), and also merged the offense of discharging a firearm at or near prohibited premises (Count 7) with the remaining attempted murder convictions (Counts 1 and 4). The state elected to proceed on the attempted murder convictions.

{¶ 42} For each attempted murder conviction, the trial court sentenced Lennon to three years in prison for the firearm specifications, to be served prior to and consecutive to seven years in prison on the underlying base charge of attempted murder, for a total of ten years in prison on each count. The trial court then ordered Lennon's ten-year prison sentence for each attempted murder conviction be served consecutive to one another.

{¶ 43} The trial court further sentenced Lennon to 12 months in prison for carrying a concealed weapon (Count 8), 12 months for improperly handling a firearm in a motor vehicle (Count 9), and 12 months for vandalism (Count 10), all to be served concurrent to each other, but consecutive to Lennon's prison sentence for the attempted murders, for an aggregate sentence of 21 years in prison.

On April 13, 2016, Lennon appealed his conviction through new counsel.[3] Lennon raised six appeal grounds:

(1) The trial court erred by denying appellant's motion to exclude pretrial identification testimony in violation of his rights;

(2) The trial court erred where the jury was not instructed on the failure to comply with photo lineup procedures in accordance with [Ohio Rev. Code §] 2933.83;

(3) The trial court erred by denying appellant's [Ohio Criminal Rule] 29 motions because the convictions were not supported by sufficient evidence;

---

[3] Doc. 8-2 at 38.

Case No. 1:18-cv-2216
Gwin, J.

> (4)  The convictions were against the manifest weight of the evidence;
>
> (5)  Appellant's sentence is contrary to law and the record does not support the imposition of consecutive sentences; and
>
> (6)  The trial court erred by admitting state's exhibit 90 over appellant's objection and in violation of [Ohio Rules of Evidence] 401, 402 and 403.[4]

On May 11, 2017, the Ohio Court of Appeals affirmed Lennon's conviction and sentence.[5]

On August 11, 2017, well after the 45-day appeal deadline had passed, Lennon filed a pro se notice of appeal with the Ohio Supreme Court.[6]  Along with his late appeal, Lennon filed a motion for leave to file an untimely appeal, claiming that due to his appellate counsel's error, he did not receive the Ohio Court of Appeals May 11, 2017 decision affirming his conviction in sentence until three days before the appeal deadline.[7]  The Ohio Supreme Court denied Lennon leave to appeal.[8]

On August 14, 2017, Lennon filed an untimely application to reopen his appeal to claim ineffective assistance of appellate counsel.[9]  The application, which was filed after the 90-day application deadline from the Ohio Court of Appeals May 11, 2017 decision affirming his sentence, asserted that Lennon's appellate counsel was ineffective for failing to raise the following appellate claims:

> (1)  Trial counsel was ineffective in failure to his duty to properly investigate key evidence, as it relates to alibi witnesses at trial, when a notice of alibi pursuant to [Ohio Criminal Rule] 12.1 was filed, and failure to fully investigate actual innocence and advance affirmative defense, which prevented proper trial preparation and defense, a violation in breach of the Sixth and Fourteenth

---

[4] *Id.* at 43.
[5] *Lennon*, 2017 WL 1957124, at *13.
[6] Doc. 8-2 at 131–37.
[7] *Id.* at 135.
[8] *State v. Lennon*, 82 N.E.3d 1175 (Ohio 2017) (Table).
[9] Doc. 8-2 at 177.

Case No. 1:18-cv-2216
Gwin, J.

> Amendment to the United States Constitution and Article I, Sections 10 and 16 of the Ohio Constitution;
>
> (2) Trial counsel was ineffective by violating Lennon's right to compulsory process, a constitutionally protected right under the Sixth Amendment to the United States Constitution, which the Fourteenth Amendment makes obligatory on the states, conversely the right of compelled process is a constitutionally mandated rule of pretrial discovery; and
>
> (3) Trial counsel was ineffective when he failed in his duty to investigate witnesses who may have information concerning his client's innocence, trial counsel's failure to conduct a prompt investigation of the circumstances of the case and to explore all avenues leading to relevant facts to the merits of the case, thereby prejudice Lennon denying him of due process of the law and a fair trial, a violation of the Sixth Amendment right to effective assistance of counsel.[10]

On December 8, 2017, the Ohio Court of Appeals denied Lennon's claims as untimely, while also pointing out that his claims would be unsuccessful on the merits in any event.[11] Lennon did not appeal to the Ohio Supreme Court.

On September 26, 2018, Lennon filed a 28 U.S.C. § 2254 petition in this Court, raising the following grounds for habeas relief from his 21-year attempted murder sentence:

> **GROUND ONE:** Prosecutorial misconduct
>
> **Supporting Facts:** (A) Here the facts shows the prosecutor (in the wake of his having called as a witness an alleged victim in an attempted murder case), who he was fully aware would commit what he (the prosecutor) believed was perjury, commits reversible error when he openly and brazenly sought to enhance his case based on innuendos, and the like, based (as he put it) on outright perjury, which was emphasized in his inflammatory oratory - - indeed that were punctuated with colorful and abusive rhetoric, which denigrated, both, the accused and the alleged victim.
>
> (B) Where the prosecutor is aware that an alleged shooting victim says he cannot identify the accused, and would be committing perjury (in other aspects of his testimony), clearly this was for the sole purpose of impressing

---

[10] *Id.* at 180–84.

[11] *State v. Lennon*, No. 104344, 2017 WL 6398311, at *1–2 (Ohio Ct. App. 8th Dist. Dec. 8, 2017).

Case No. 1:18-cv-2216
Gwin, J.

the jury with the idea that he, either, feared reprisals or some other ulterior reasons existed.

(C) Given the law is clear here, indeed beyond the dispute, that an attorney in arguing to the jury may not, and should not, express their opinions as to the credibility of any witness, it follows (because these prosecutors failed to take any heed whatsoever to that edict), that our petitioner was deprived of due process when, as unsworn witnesses, these prosecutors testified during their summations,

(D) Where as here, the prosecutor conveys to the jurors the personal views, and opinions, that the two (2) identification witnesses involved spoke the truth when they identified the accused, it is most difficult, if not impossible, for the jury to ignore their views, however biased or baseless they may in fact be. [Footnote *Berger v. United States,* 295 U.S. 78, 88 (1934)].

**GROUND TWO:** Identification issues

**Supporting Facts:** Given the law seems clear enough, as it has been put that the trial court should "Caution the jury about the dangers of misidentification and instruct the jury about how to weigh the evidence," [Footnote; See *United States v. O'Neil,* 496 F. 2d 368, at 373 (6th Cir. 1974)] clearly the court's failure here to do so offended due process.

**GROUND THREE:** Ineffective assistance of counsel.

**Supporting Facts:** (A) An accused has been and was denied due process, when, both his trial and appellate counsel were constitutionally deficient and he was prejudiced by deficiency. [Footnote: *Strickland v Washington*, 466 U.S. 668 at 667 (1984)].

**GROUND FOUR:** The evidence in support of the conviction was insufficient as a matter of law.[12]

The state of Ohio opposes Lennon's habeas petition,[13] and Lennon replies.[14] The Court now takes up Lennon's habeas petition.

II.     LEGAL STANDARD

---

[12] Doc. 1.
[13] Doc. 8.
[14] Doc. 12.

Case No. 1:18-cv-2216
Gwin, J.

The Antiterrorism and Effective Death Penalty Act, or "AEDPA," allows federal courts to grant relief for "extreme" constitutional "malfunctions" in a petitioner's state criminal proceedings.[15]  AEDPA relief may address only federal constitutional concerns.  "[I]t is not the province of a federal habeas court to re-examine state-court determinations on state-law questions."[16]

To obtain relief under AEDPA, Lennon must show: (1) that the state court decisions he challenges were "contrary to or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States,"[17] and (2) that the federal error "had a substantial and injurious effect or influence in determining the jury's verdict."[18]

AEDPA is "not a substitute for ordinary error correction through appeal."[19]  Accordingly, a state court decision must be not simply wrong but objectively unreasonable in a fundamentally prejudicial way to warrant § 2254 relief.[20]

Crucially, AEDPA also affords Ohio courts the full and fair opportunity first consider alleged violations of Ohio prisoners' federal rights before Ohio judgments may be collaterally challenged in federal court.[21]  Claims not presented to the Ohio courts or not

---

[15] *Brecht v. Abrahamson*, 507 U.S. 619, 634 (1993).
[16] *Stewart v. Winn*, 967 F.3d 534, 541 (6th Cir. 2020) (citing *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991)).
[17] 28 U.S.C. § 2254(d).
[18] *Brecht*, 507 U.S. at 638.
[19] *Harrington v. Richter*, 562 U.S. 86, 102–03 (2011).
[20] *Williams v. Burt*, 949 F.3d 966, 974 (6th Cir. 2020).
[21] *Duncan v. Henry*, 513 U.S. 364, 365 (1995) (per curiam).

-13-

Case No. 1:18-cv-2216
Gwin, J.

presented in compliance with Ohio procedural rules without a compelling excuse are defaulted and unreviewable in federal court.[22]

Before this Court will consider Lennon's claims, he must accordingly show that he has already exhausted his Ohio remedies by "fairly present[ing] his claim in each appropriate state court," "including a state supreme court with powers of discretionary review."[23]  In this context, the Sixth Circuit has specifically held that a denied untimely appeal to the Ohio Supreme Court results in procedural default.[24]

## III.    DISCUSSION

To repeat, Lennon asserts federal habeas claims regarding prosecutorial misconduct, misidentification, ineffective assistance of trial and appellate counsel, and evidence insufficiency. Lennon should have asserted all but his ineffective assistance of appellate counsel claim on his initial discretionary appeal to the Ohio Supreme Court.

Lennon failed to raise his claims until after the discretionary appeal deadline passed, and the Ohio Supreme Court denied his motion for leave to file an untimely appeal.[25] Accordingly, Lennon's prosecutorial misconduct, misidentification, ineffective assistance of trial counsel, and evidence insufficiency habeas claims are defaulted.[26]

Lennon cannot show cause and prejudice to excuse his default.   Because the defaulting event is his failure to timely appeal to the Ohio Supreme Court, Lennon must provide cause and prejudice to excuse that particular failure.

---

[22] *O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999).
[23] *Baldwin v. Reese*, 541 U.S. 27, 29 (2004).
[24] *Bonilla v. Hurley*, 370 F.3d 494, 497–98 (6th Cir. 2004).
[25] *Lennon*, 82 N.E.3d at 1175.
[26] *Bonilla*, 370 F.3d at 497–98.

-14-

Case No. 1:18-cv-2216
Gwin, J.

Counsel's deficient performance in state court generally can serve as grounds for excusing a petitioner's procedural default on federal habeas review.[27]  But because the right to effective assistance of counsel is derived from the Sixth Amendment right to counsel, the petitioner must show that he had the right to counsel at the stage of the proceeding where the procedural default occurred to prevail on an ineffective assistance cause and prejudice theory.[28]

This rule forecloses Lennon's federal habeas prosecutorial misconduct, misidentification, ineffective assistance of trial counsel, and evidence insufficiency claims. The Sixth Amendment counsel right does not extend to discretionary appeals to state supreme courts.[29]  Lennon therefore cannot excuse his default at the Ohio Supreme Court stage by claiming ineffective assistance of counsel.  Lennon's excuse about appellate counsel's failure to seek a discretionary appeal on Lennon's behalf or send Lennon documents necessary to file his appeal pro se therefore lacks merit.[30]

With respect to Lennon's remaining claim, Ohio law allows petitioners to raise ineffective assistance of appellate counsel claims in a special collateral motion to reopen their appeal.[31]  But Lennon twice defaulted these claims: first by failing to timely raise them in his motion to the Ohio Court of Appeals and then by entirely failing to present the claims

---

[27] *Williams*, 949 F.3d at 973.

[28] *Smith v. Ohio Dep't of Rehab. & Corr.*, 463 F.3d 426, 433 (6th Cir. 2006).

[29] *Pennsylvania v. Finley*, 481 U.S. 551, 555 (1987).

[30] *See Coleman v. Thompson*, 501 U.S. 722, 757 (1991) ("Because Coleman had no right to counsel to pursue his appeal in state habeas, any attorney error that led to the default of Coleman's claims in state court cannot constitute cause to excuse the default in federal habeas.").

[31] *State v. Davis*, 894 N.E.2d 1221, 1223–24 (Ohio 2008) (discussing Ohio App. R. 26(B)).

-15-

Case No. 1:18-cv-2216
Gwin, J.

for discretionary review to the Ohio Supreme Court after the Ohio Court of Appeals denied Lennon's claims as untimely.

Like discretionary appeals, the Sixth Amendment counsel right does not typically extend to state collateral proceedings, meaning that Lennon may not rely on ineffective assistance of collateral counsel to show cause and prejudice excusing his procedural default.[32]

True, the Supreme Court has recognized a limited exception to the collateral procedural default rule where a petitioner's first chance to claim ineffective assistance of *trial* counsel comes in collateral state proceedings.[33]  But the Court has expressly declined to extend this exception to ineffective assistance of *appellate* counsel claims.[34]  Therefore, Lennon's appellate counsel claim is defaulted without exculpatory cause and prejudice.

Moreover, Lennon then double defaulted his appellate counsel claim by failing to present it to the Ohio Supreme Court, yet another stage of the proceeding at which he had no right to counsel.[35]  Lennon provides no cause and prejudice evidence to excuse this second default.

The Court accordingly finds each of Lennon's federal habeas claims defaulted. Further, Lennon does not attempt to make a compelling showing of actual innocence which

---

[32] *Scuba v. Brigano*, 527 F.3d 479, 489 (6th Cir. 2007).
[33] *Gerth v. Warden, Allen Oakwood Corr. Inst.*, 938 F.3d 821, 831–32 (6th Cir. 2019) (citing *Martinez v. Ryan*, 566 U.S. 1, 9 (2012)).
[34] *Id.* (citing *Davila v. Davis*, 137 S. Ct. 2058, 2065–67 (2017)).
[35] *Finley*, 481 U.S. at 555.

-16-

Case No. 1:18-cv-2216
Gwin, J.

might otherwise allow the Court to review his claims.[36]  Accordingly, the Court declines to

review each of Lennon's federal habeas claims.

IV.     CONCLUSION

For these reasons, the Court **DENIES** Lennon's 28 U.S.C. § 2254 petition.

IT IS SO ORDERED

Dated: February 11, 2021                    _s/      James S. Gwin_
                                            JAMES S. GWIN
                                            UNITED STATES DISTRICT JUDGE

---

[36] *See McQuiggin v. Perkins*, 569 U.S. 383, 401 (2013) ("The [procedural default actual innocence] gateway should open only when a petition presents evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error.") (internal quotations omitted).

-17-